IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| UNITED STATES OF AMERICA, | § | |
| --- | --- | --- |
| | § | |
| Appellant/Cross-Appellee, | § | |
| | § | |
| v. | § | Case No. 3:05-CV-2468-L |
| | § | |
| WALTER O'CHESKEY, | § | |
| TRUSTEE FOR THE CHAMA ESTATES, | § | |
| | § | |
| Appellee/Cross-Appellant. | § | |

## MEMORANDUM OPINION AND ORDER

Before the court is an appeal from the Memorandum Opinion and Order on Remand, issued May 20, 2005 by the United States Bankruptcy Court for the Northern District of Texas, Dallas Division. After careful consideration of the briefs, the record on appeal, and the applicable law, the court **affirms in part and reverses in part** the holding in the Memorandum Opinion and Order on Remand.

**I.     Background**

Litigation in this case has been ongoing for over ten years. The underlying facts are complex and are set forth in prior opinions of the court. Rather than repeating all facts of this case, the court will only restate those that it finds necessary for clarity and understanding of this opinion.

In the 1980s, Grady Vaughn ("Grady") and his younger brother Gary Vaughn ("Gary") owned shares of stock in Chama Land and Cattle ("Chama L & C"). The assets of Chama L & C consisted of a 32,000-acre game ranch in New Mexico (the "Ranch"), a hunting lodge, two 3200-acre Class A game parks licensed by the state of New Mexico, and a large elk herd. Grady, as one of the trustees of Gary's support trust, managed Gary's inherited assets, including Gary's share of

**Memorandum Opinion-Page 1**

Chama L & C. Gary's trust assets were valued at over $8 million. Grady was obligated on over $20 million in notes held by NCNB Texas National Bank, which were later acquired by Regency Savings Bank, F.S.B. ("Regency"). To secure the notes, Grady consented to liens on some of his property and pledged his 68.8% interest in Chama L & C.

In 1989, Grady hired Malcolm Kelso ("Kelso"), a "crisis manager," to reorganize his bank debt and to aid him in dealing with the federal and state authorities' investigation of Chama L & C and its management. In 1990, Grady, Kelso, and others implemented a series of corporate transactions (the "1990 Transactions") that allegedly were to protect Chama L & C's assets from the state of New Mexico and Grady's creditors, including Regency. The 1990 transactions resulted in the effective transfer of substantially all of the assets of Chama L & C to three newly formed entities (the "New Chama Entities") that were controlled by Kelso.

In 1991, Gary sued Grady, Kelso, and others for the damage to his trust assets caused by the 1990 Transactions. Gary alleged damages of over $70 million, which included actual damages of approximately $28 million and multiple punitive damages claims. Grady, Kelso, and the other defendants denied liability and filed counterclaims and cross-claims. Around the same time, Grady defaulted on the notes held by Regency, and Regency instituted collection actions.

The litigation caused Chama L & C, New Chama Entities (together with Chama L & C, "the Chama Estates"), Grady, and Kelso to file for Chapter 11 bankruptcy in 1993. Walter O'Cheskey was appointed Chapter 11 Trustee ("Trustee") for the Chama Estates. Gary filed proofs of claim against Grady and the Chama Estates for approximately $70 million. Regency also filed claims alleging multiple bases of recovery against Grady, the Chama Estates, and others, seeking damages of approximately $11 million. In 1994, Regency filed an adversary proceeding asserting various

claims against the Chama Estates and others involved in the 1990 Transactions. All litigation was consolidated in the bankruptcy court. In July 1994, the bankruptcy court made findings denying all of Regency's claims against the Chama Estates, but failed to enter judgment to that effect.

To prevent the assets from continuing to lose value, Trustee moved to sell the Chama Estates' assets. In March 1995, the bankruptcy court approved Trustee's motion, and the proceeds from the sale provided the basis for Trustee's plan of reorganization for the Chama Estates (the "Plan"). While the sale was pending, all principal parties except Kelso proposed settlements and supported the Plan and the other bankruptcy plans. Kelso litigated his claims with all of the bankruptcy estates, but the bankruptcy court ultimately denied his objections, disallowed his claims, and confirmed all of the plans, including the settlements within them. Although Gary and Regency would receive distributions, The Plan did not allocate the distributions between equity interests and damages. Instead, Trustee would seek a determination of the Chama Estates' tax liability from the bankruptcy court pursuant to 11 U.S.C. § 505. Pursuant to the Plan, Trustee, Gary, and Regency signed a release that released "all actual or potential claims, demands, damages, actions, requests for sanctions and causes of action, torts, obligations, and any and all other liabilities, whether known or unknown of any kind or description whatsoever." (Appellant's Br. Ex. B at 5).

In 1996, Trustee filed federal income tax returns and made estimated payments for the Chama Estates for the 1995 tax year. Because the bankruptcy court had not made a determination of the tax liability for the Chama Estates, the return and payment were estimates of the tax consequences for the sale of the Ranch. Trustee claimed a deduction of $ 3,345,446 for damage claims to Gary. The Internal Revenue Service ("IRS") audited the Chama Estates' returns and disallowed Trustee's deduction.

In July 1997, Trustee filed a motion for determination of tax liability pursuant to 11 U.S.C. § 505 on behalf of Chama Estates to request the bankruptcy court to determine that he had properly allocated plan distributions between damage deductions and nondeductible distributions for stock redemption on Chama Estates' 1995 income tax returns. Trustee subsequently amended the tax returns to claim a damage deduction for Regency, increase the claimed damage deductions for Gary, and claim the existence of two qualified settlement funds ("QSFs"). In September 1998, after filing the amended tax returns, Trustee amended his motion.

On November 15, 1999, the bankruptcy court determined that the distributions to Gary and Regency were not deductible because they were for return of equity rather than for damages and that no QSFs had been established. Trustee appealed.

On appeal, Trustee, alleging several legal theories, argued that the bankruptcy court erred in not conforming to the findings at the confirmation hearing that the claims of Gary and Regency exceeded the amounts received under the Plan. Trustee also argued that damages to Gary and Regency had been established and the requirements of I.R.C. § 162 for deductibility of the payments as ordinary and necessary business expenses were met. Trustee further argued that the bankruptcy court erred in finding that no QSFs had been established because the funds met the three requirements for QSF establishment.

IRS argued that the bankruptcy court did not err in finding that the distributions to Gary and Regency were for return of equity because (i) the Plan did not allocate payments between equity and damages, (ii) Gary executed a release of his claims pursuant to the Plan, (iii) Regency had previously lost on its damage claims, and (iv) Gary and Regency irrevocably transferred their equity interests in order to receive Plan distributions. IRS also argued that the payments were not
**Memorandum Opinion-Page 4**

deductible because they did not meet the requirements of I.R.C. § 162 and that on their respective tax returns, Gary and Regency had taken positions that were inconsistent with the Chama Estates' claim that the payments were for damages. IRS further argued that naming the funds as QSFs was a tax-motivated afterthought, the QSFs were not formed with the proper intent to do so, the segregation requirement for QSF establishment was not met because distributions to Gary and Regency were made from the same account used to pay general creditors, and the governmental approval requirement for QSF establishment was not met because the bankruptcy court did not specifically so designated the funds.

On December 21, 2001, the district court entered a Memorandum Opinion and Order ("First Appeal Order") holding that: (i) the bankruptcy court was correct in determining that the payments to Regency were in satisfaction of its stock holdings and not as payment for damages, (ii) at least some of the payments by Trustee to Gary must have constituted payment for damages and not for stock distribution, (iii) proper payments to Gary to settle any damage claims against the Chama Estates may be deductible as ordinary and necessary business expenses, and (iv) the basic requirements of a qualified settlement fund ("QSF") had been met. This case was then remanded to the bankruptcy court for calculation of the amount of the payments to Gary that were for damages and for a determination of Trustee's tax liability in accordance with the order.

On remand, the bankruptcy court did not reopen the record to receive additional testimony regarding Gary's damages, but held that none of the distributions to Gary was for damages. Because the case had been remanded, as the district court found that at least some of the distributions to Gary were for damages, the bankruptcy court, in an alternative ruling, determined that of the total distributions to Gary, only $198,718 was made in payment of damages claims and the remainder was

**Memorandum Opinion-Page 5**

a return of equity. The bankruptcy court also held that the $198,718 qualified for QSF treatment. Both Trustee and IRS appealed.

On the second appeal, the court, without a memorandum opinion, noted that "the Bankruptcy Court refused to permit the Trustee to present evidence relevant to the allocation of distributions to Gary Vaughn" and that "[b]ecause the record still lacks evidence as to the proper allocation of the distributions to Gary Vaughn, it is still impossible, as Judge Solis previously found, to determine the division of those distributions into equity payments versus the satisfaction of damages claims." (1R 173) The court again remanded the case to the bankruptcy court.

On second remand, the bankruptcy court, after conducting a hearing as to Gary's damages, held that (i) $3,766,966 of the $5,272,303.55, the total amount distributed to the Gary in 1995, was for debt repayment and the remaining $1, 505,337 was for Gary's damages claims against Chama and (ii) Debtors are not entitled to deduct the unpaid New Mexico state income taxes. The IRS now appeals, and Trustee cross appeals.

## II.    Standard of Review

In a bankruptcy appeal, district courts review bankruptcy court rulings and decisions under the same standards employed by federal courts of appeal: a bankruptcy court's findings of fact are reviewed for clear error, its conclusions of law are reviewed *de novo,* and mixed questions of fact and law are reviewed *de novo*. *See Robertson v. Dennis (In re Dennis)*, 330 F.3d 696, 701 (5th Cir. 2003); *Century Indem. Co. v. Nat'l Gypsum Co. Settlement Trust (In re National Gypsum Co.)*, 208 F.3d 498, 504 (5th Cir.), *cert. denied,* 531 U.S. 871 (2000); *Bass v. Denny (Matter of Bass)*, 171 F.3d 1016, 1021 (5th Cir. 1999) (mixed questions of law and fact subject to *de novo* review). A finding is clearly erroneous and reversible only if, based on the entire evidence, the reviewing court

is left "with the definite and firm conviction that a mistake has been made." *In re Allison*, 960 F.2d 481, 483 (5th Cir. 1992).

### III. Analysis

The issues before the court are as follows: (i) whether the bankruptcy court, on second remand, erred in holding that all of the Trustee's 1995 distributions to Gary were for damages claims; (ii) whether the bankruptcy court, on second remand, exceeded the scope of remand in holding that Trustee's 1996 and 1997 distributions to Gary were for damages claims; (iii) whether the bankruptcy court's holding, on second remand, that Trustee's 1995, 1996, and 1997 distributions to Gary were for damages claims violated the absolute priority rule; (iv) whether the bankruptcy court, on second remand, erred in holding that Chama Estates were not entitled to deduct unpaid New Mexico state income tax; (v) whether the bankruptcy court, on first remand, erred in holding that Trustee's 1995 distribution to Gary qualified for QSF treatment; (vi) whether the district court, on first appeal, erred in holding that some of Trustee's distributions to Gary were for damages claims; (vii) whether the district court, on first appeal, erred in holding that two QSFs were established; and (viii) whether the district court, on first appeal, erred in holding that none of Trustee's distributions to Regency was for damages claims. For clarity, the issues are grouped and addressed by the point in the procedural history the alleged error occurred.

#### A. First Appeal

IRS alleges that the district court erred in the first appeal in holding that some of Trustee's distributions to Gary should be allocated to damages and that two qualified settlement funds were established upon confirmation of Trustee's Plan. Trustee alleges that the district court erred in the

first appeal in holding that none of Trustee's distributions to Regency was in payment for damages.

### 1. Allocation of Trustee's Payments to Gary as Damages

IRS argues that the district court erred when it held that at least some of Trustee's distributions to Gary should be allocated to damages and that those payments were deductible under I.R.C. § 162. Because IRS concedes that the law of the case doctrine applies to this issue and raises it solely to preserve it for appeal to the Fifth Circuit, the court need not address the issue at this time.

### 2. Failure to Allocate Trustee's Payments to Regency as Damages

Trustee argues that this court erred in affirming the bankruptcy court's refusal to allocate Trustee's payments to Regency as damages. Because this issue was conclusively resolved by the court's decision on the first appeal, the law of the case doctrine applies. The law of the case doctrine contemplates that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815-16 (1988). This doctrine "promotes the finality and efficiency of the judicial process by protecting against the agitation of settled issues." *Id.* at 816. (internal quotation marks omitted). "The doctrine applies as much to the decisions of a coordinate court in the same case as to a court's own decisions." *Id.* The court will not review the allocation of payments to Regency unless an exception exists. An exception to the law of the case doctrine exists where "(i) the evidence on a subsequent trial was substantially different, (ii) controlling authority has since made a contrary decision of the law applicable to such issues, or (iii) the decision was clearly erroneous and would work a manifest injustice." *Tollett v. City of Kemah*, 285 F.3d 357, 365 (5th Cir.), *cert. denied,* 537 U.S. 883 (2002).

Although Trustee restates the arguments made during the first appeal, he fails to allege a specific exception to the law of the case doctrine or set forth facts to establish such an exception. Trustee does not point the court to any new evidence adduced in the second remand regarding this issue, and the court can otherwise find no indication that new evidence regarding allocation of Trustee's payments to Regency as damages was adduced on remand. Therefore, the first exception to the law of the case doctrine is not met. Similarly, Trustee does not direct the court to, nor is the court able to find, any intervening change of law by a controlling authority that would warrant a determination different than was made on the first appeal of this issue. Therefore, the second exception to the law of the case doctrine is also not met. Finally, the court must determine whether the earlier decision by this court was clearly erroneous and would work a manifest injustice.

On first appeal, the court reviewed the bankruptcy court's refusal to allocate Trustee's payments to Regency as damages based on the law of the case doctrine, *stare decisis*, collateral estoppel, and res judicata. After reviewing the First Appeal Order and independently reviewing Trustees arguments, the relevant case law, and the record, the court agrees with the analysis as set forth in the First Appeal Order. Thus, the court did not plainly err in affirming the bankruptcy court's refusal to allocate Trustee's payments to Regency as damages. Because the court's decision was not clear error, the last exception to the law of the case doctrine does not apply. Accordingly, the court will apply the law of the case doctrine and will not review the allocation of payments to Regency.

### 3. Establishment of Qualified Settlement Funds

IRS alleges that the court erred in the first appeal in holding that two qualified settlement funds ("QSFs") were established upon confirmation of Trustee's Plan, because the payments Gary

**Memorandum Opinion-Page 9**

received in 1996 and 1997 from funds contained in the two QSFs were not made to "resolve or satisfy" the purpose for which the funds were created. (Appellant's Br. 46). A fund qualifies as a QSF even if it is established to resolve or satisfy allowable claims in addition to non-allowable claims arising for the same series of events, but "economic performance does not occur with respect to transfers to the [QSF] for the non-allowable claims." Treas. Reg. § 1.468B-1(h)(2). After reviewing the First Appeal Order and independently reviewing the arguments, the relevant case law, and the record, the court agrees with the analysis as set forth in the First Appeal Order and finds that the two QSFs were established. To the extent that non-allowable claims were paid from funds in either QSF, however, economic performance did not occur and those payments would not be entitled to QSF treatment in 1995 for federal tax purposes. All payments to Regency were in satisfaction of its stock holdings and, as will be discussed later in this opinion, all payments to Gary that were not for debt repayment were for his damages claims. Therefore, all distributions to Gary for damages from the QSFs are entitled to QSF treatment, but distributions to Regency are not.

### B.     First Remand

IRS alleges that the bankruptcy court erred in allowing a deduction for $198,718.17 in damages to Gary for the 1995 tax year pursuant to Treas. Reg. § 1.468B-1(c)(2). The bankruptcy court reasoned that the payment was "in satisfaction of an allowable claim" under the regulation. (Appellant's Br. Ex. D at 12). A QSF allows a taxpayer to establish economic performance in a current tax year by making payments to the fund. Treas. Reg. § 1.468B(a). Treas. Reg. § 1.468B-1(c)(2) sets forth the requirements for a QSF. Treas. Reg. § 1.468B-1(c)(2) sets forth the requirements for a QSF. In a footnote, the bankruptcy court acknowledged the holding of the district court that any distributions made to pay damages were deductible as an ordinary and necessary

business expense. (Appellant's Br. Ex. D at 12). Because the court had already determined that any payment to Gary for damages is deductible in the tax year payment was made, there was no need to consider it for QSF treatment. Accordingly, the bankruptcy court erred in subjecting the payment to QSF treatment.

### C.     Second Remand

IRS appeals several issues from the bankruptcy court's decision on second remand. Each issue is addressed below.

#### 1.     Scope of Remand

IRS first argues that the bankruptcy court erred in exceeding the scope of remand when it held that all distributions to Gary were for damages. According to IRS, the 1996 and 1997 tax years were not before the bankruptcy court on this remand. The court agrees.

This litigation began in 1997 when Trustee filed a motion with the bankruptcy court to determine the federal income tax liability for Chama Estates for the 1995 tax year. When the court remanded this case to the bankruptcy court "for calculation of the amount of the payments to Gary that were for damages claims and for determination of the Trustee's tax liability," the 1995 tax year was the only year before the court. (Appellant's Br. Ex. B at 34). The 1996 and 1997 tax years were only visited by the court for the purpose of determining the losses available for carryback to reduce the taxable income for the Chama Estates for tax year 1995. (Appellant's Br. Ex. B at 29). The 1996 and 1997 tax year disputes were (and remain) pending in Tax Court. The court held that the bankruptcy court did not abuse its discretion in declining to decide the 1996 and 1997 net operating losses. (Appellant's Br. Ex. B at 31). Therefore, the bankruptcy court exceeded the scope of remand and erred in characterizing the 1996 and 1997 payments to Gary as damages.

**Memorandum Opinion-Page 11**

## 2. Allocation of the Distributions to Gary as Damages

IRS contends that it was error for the bankruptcy court to conclude that all of the distributions to Gary that were not for debt repayment were for damage claims. IRS alleges multiple errors.

First, IRS argues that the bankruptcy court abused its discretion in allocating all non debt repayment distributions to damage claims because it based its analysis on this court's incorrect holding regarding the existence of Gary's damages claims. The court on first appeal considered the facts and circumstances to determine the parties' intent, the reporting discrepancies between Gary and the Chama Estates, the mutual release among the settling parties, and the failure of Gary to testify and concluded that "at least some of the payments by the Trustee to Gary must have constituted payment for damages" and remanded the case to the bankruptcy court "for calculation of the amount of the payments to Gary that were for damages claims and for determination of the Trustee's tax liability." (Appellant's Br. Ex. B at 16, 34). Because IRS does not allege any exception to the law of the case doctrine, the court will not reexamine the court's prior holding. The bankruptcy court followed the law of the case, so the district court is unable to conclude that it abused its discretion.

Second, IRS argues that the bankruptcy court's holding contradicts the district court's analysis. IRS quotes from the First Appeal Order that "it appears at least some of the payments by the Trustee's distributions to Gary might not be stock equity" and emphasizes the word some. (Appellant's Br. 32). IRS's emphasis distorts the context within which the word appears. The court indicated that *at least some* payments to Gary might not be stock equity. The court was unable to

determine the extent to which any payments to Gary were for damages, so it remanded to the bankruptcy court to make the determination.

IRS also argues that on first remand, the bankruptcy court equitably voided the 1990 Transactions, thereby returning the Chama Estate to the pre-1990 condition and concluded that any damages sustained would have been caused by Kelso. (Appellant's Br. 32). On second remand, however, the bankruptcy court heard testimony as to Gary's lost earnings, the diminished value of the trust assets, the costs to recover assets, attorney's fees, mental anguish, and loss of consortium. (3R 510). The bankruptcy court noted that Gary sought to recover over $28 million in his suit against all of the bankruptcy debtors and each debtor could be jointly and severally liable. (4R 699, 706). Based on the entirety of the record, the court affirms the findings of the bankruptcy court.

Third, IRS argues that the bankruptcy court's holding cannot be given binding effect because it is uncontested, non-adversarial, and completely tax motivated. This argument was addressed on first appeal. (Appellant's Br. Ex. B at 16). Because IRS does not allege any exception to the law of the case doctrine, the court will not reexamine the court's prior holding.

Finally, IRS contends that the bankruptcy court's holding is not supported by Appellee's remand evidence. IRS argues that reliance on Trustee's witnesses is misplaced because the testimony was either redundant, irrelevant, or self serving. IRS also argues that the expert who testified as to Gary's damages did not qualify under *Daubert v. Merrell Dow Pharmaceutical, Inc.*, 509 U.S. 579 (1993). The court disagrees.

The bankruptcy court considered the entirety of the record, both the evidentiary record of the previous proceedings and the evidence adduced on remand, in making its decision and concluded:

**Memorandum Opinion-Page 13**

> Gary had significant damages claims against the Debtors, including Chama, for which each debtor could be jointly and severally liable. The trustee needed substantially all of the litigating parties to settle their claims against each other (including the Debtors) in order to propose a meaningful plan of reorganization for the Debtors. It was the morass of the litigation claims pending in the bankruptcy cases, not the equity interests in the Debtors, that was precluding the formulation of, and confirmation of, a plan of reorganization for the Debtors. The fact that the equity interests in the Debtors were irrevocably transferred to the Trustee as of the Distribution Date does not mean that the trustee "redeemed" Gary's Chama stock or made payments to Gary on account of that stock.

(4R 694). Even if the expert was not qualified under *Daubert* or Federal Rule of Evidence 702, the record amply supports the bankruptcy court's findings. Accordingly, there is no clear error, and the court affirms the bankruptcy court's primary holding, to the extent that it makes a determination for the 1995 tax year before the court as previously discussed.

### 3. Absolute Priority Rule

IRS next argues that the bankruptcy court violated the absolute priority rule when it held that the 1995, 1996, and 1997 payments made to Gary were for damages. According to IRS, because all claims or interests in a class are required to be substantially similar, payments made to a class must be for the same purpose. Consequently, IRS contends, if all payments to Gary are deemed to be damages and all payments to Regency are deemed to be for equity interest, there is either a violation of the absolute priority rule or a misclassification of the claims. As discussed previously, the 1996 and 1997 tax years are not before the court. With regard to the 1995 tax year, the court disagrees.

The absolute priority rule requires payment in full to a senior class of creditors before any payments can be made to junior interests. 11 U.S.C. § 1129(b)(2)(B). The rule only arises when a court confirms a plan over the objections of a class that the plan is not fair and equitable. *See, e.g.,*

**Memorandum Opinion-Page 14**

*Matter of Briscoe Enterprises, Ltd., II.*, 994 F.2d 1160 (5th Cir.), *cert denied*, 510 U.S. 992 (1993). The court finds nothing in the record to show that either Gary or Regency objected to the plan. To the contrary, both irrevocably transferred their equity interests as required by the terms of the plan. Therefore, the court finds that the class did not object to the fairness of the plan and that the absolute priority rule does not apply.

Turning now to the misclassification argument, a claim or interest can be assigned to a class "only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a). The bankruptcy court reasoned that when the plan was created, the claims and interests of Gary and Regency were substantially similar because both Regency and Gary had "contingent, unliquidated, disputed claims and undisputed equity interests." (4R 748: 7-11). IRS counters that since Regency had lost on its damages claims, the only substantially similar interest between it and Gary was an equity interest. It is undisputed that both Gary and Regency had equity claims. Because the court held on first appeal that Gary had viable damages claims and Regency did not, there is no occasion to revisit this issue. The court finds that the common denominator, as alleged by Appellee and emphasized by IRS, is that both Gary and Regency were "parties with recognized equity interests." (Appellant's Br. 42). This classification does not negate the existence of Gary's claims in addition to his equity interests. It merely recognizes that both parties had recognized equity interests. IRS's argument fails, and the bankruptcy court did not err in finding that the claims were properly classified.

### 4. Unpaid New Mexico State Income Taxes

Trustee contends that the bankruptcy court erred in finding the Chama Estates were not entitled to a deduction for the unpaid New Mexico state income taxes. An accrual basis taxpayer

may generally deduct an expense only "in the taxable year in which all the events have occurred that establish the fact of the liability, [when] the amount of the liability can be determined with reasonable accuracy, and [when] economic performance has occurred with respect to the liability". Treas.Reg. § 1.146-1(a)(2). The parties do not dispute that all events have occurred to establish the fact of the state tax liability.

In deciding whether the amount of liability can be determined with reasonable certainty, the parties differ on the applicability of *Consolidated Indus., Inc. v. Commissioner*, 82 T.C. 477 (1984), *aff'd per curiam*, 767 F.2d 41 (2d Cir. 1985). *Consolidated* holds that when state and federal tax liabilities "move in tandem," a contest of one is necessarily a contest of the other, and the amount of a contested liability cannot be determined with reasonable accuracy. *Id.* at 482. Trustee contends that *Consolidated* is distinguishable from the facts of this case because, in that case, the state tax scheme mandated amendment of state tax returns to correspond with adjustments to the federal tax return and because the taxpayers in that case were not in liquidation. The court finds these arguments to be accurate, but not dispositive. Regardless of the differences in the taxpayers and the amendment mandated by the state tax scheme in *Consolidated*, the plain language of the regulation requires the amount of the liability to be determined with reasonable certainty. Here, the federal income tax liability has not yet been determined, and the amount of the state tax liability is premised on a calculation of the federal income tax liability. It is not possible to determine the amount of the state tax liability with reasonable certainty until the federal income tax liability is established.

The final requirement, economic performance, requires the taxpayer to pay the governmental authority that imposed the tax. Treas. Reg. § 1.461-4(g)(6)(i). I.R.C. § 461(f) offers an exception to the economic performance requirement where there is a contested liability and "(1) the taxpayer

contests an asserted liability, (2) the taxpayer transfers money or other property to provide for the satisfaction of the asserted liability, (3) the contest with respect to the asserted liability exists after the time of the transfer, and (4) but for the fact that the asserted liability is contested, a deduction would be allowed for the taxable year of the transfer." The parties dispute only whether the Chama Estates have met the second element. The court finds that they have. Chama Estates' federal income tax returns and payments for the 1995 tax year were estimates of the tax consequences of the sale of the Ranch because the bankruptcy court had not yet made a determination of the federal tax liability for the Chama Estates. Likewise, the state tax return and payments were estimates because they were based on the estimated federal income tax liability. Therefore, when Chama Estates paid the estimated state tax liability, they transferred money to provide for the satisfaction of the state tax liability. Trustee argues, and the court agrees, that neither the plain language of I.R.C. § 461(f) nor Treas. Reg. § 1.461-4 requires the amount transferred to equal the amount ultimately deducted. Accordingly, the court finds that there was economic performance for the unpaid state income tax liability. Since all three requirements must be met for Chama Estates to deduct the state tax liability, and the second prong has not been met, the court holds that Chama Estates may not deduct the unpaid state income tax liability.

## IV. Conclusion

For the reasons stated herein, the bankruptcy court's Memorandum Opinion and Order on Remand, issued May 20, 2005 is **affirmed in part** and **reversed in part**. In particular, the court **affirms** the bankruptcy court's holding that all of the Trustee's 1995 distributions to Gary that were not for debt repayment were for damages claims and that Chama Estates were not entitled to deduct unpaid New Mexico state income tax. The court **reverses** the bankruptcy court's holding that

**Memorandum Opinion-Page 17**

Trustee's 1995 distribution to Gary qualified for QSF treatment and that Trustee's 1996 and 1997 distributions to Gary were for damages. The clerk is hereby directed to prepare, sign, and enter the judgment pursuant to Bankruptcy Rule 8016. In light of its rulings on the issues, the court orders that the parties bear their own costs of appeal.

**It is so ordered** this 5th day of October, 2007.

*Sam A. Lindsay*
Sam A. Lindsay
United States District Judge